MUSICIANS' PROTECTIVE UNION LOCAL No. 814 AMERICAN FEDERATION OF MUSICIANS, IN RE: AND CINCINNATI MUSICIANS' ASSOCIATON LOCAL No. 1, AMERICAN FEDERATION OF MUSICIANS, RESPONDENTS.

Civil Rights Commission.

No. 2.   Decided February 14, 1962.

COMMISSION

ORDER, FINDINGS OF FACT, AND REASONS

We have read the record and the thorough opinion, findings, and conclusion of Dean Barrow. Upon the basis of this record we find no ground for taking further testimony or hearing further argument, and we concur in the findings of fact and conclusion of law of the Hearing Examiner, which are made a part hereof.

Nonetheless, there exists substantial segregation between the two locals, and segregation, under our law, is discrimination (Section 4112.01 [G], Revised Code). The hard fact of the case is that there has been, and presently is, a segregated pattern of membership (Section 4112.05 [E], Revised Code). The compensation, employment opportunities, and services for members of Local 1 are considerably better than those available to members of Local 814. It strains credulity that not one Negro musician in the Cincinnati metropolitan area should seek membership in Local 1 and obtain these greater benefits; it is common knowledge that there is no lack of Negro musicians who are amply qualified. Yet no evidence is present in this record that any Negro has applied for membership in Local 1, nor that either Local has refused an applicant because of race or color. Therefore, we cannot find that the pattern of segregation is pre-determined (Section 4112.05 [E], Revised Code). While the result achieved is repugnant to the principles of the Ohio Fair Employment Practices Act because de facto segregation causes discriminatory employment opportunities, since both locals are open to all there is no violation. It may be that proof was insufficient, but we are bound by the evidence presented at the hearing (Section 4112.05 [H], Revised Code).

For these reasons we concur in and adopt the Findings of Fact and Conclusion of Law of the Hearing Examiner. We also approve and adopt his opinion, with the exception of the last paragraph of Section B of that opinion, which we disapprove (Rules and Regulations of the Ohio Civil Rights Commission,

Rule IX [C]). The discussion of the remedial powers of this Commission is not necessary to the decision of this case, and we do not accept the limitations implied. We will face this issue when it arises, and when it does we shall utilize to the full such affirmative or other action as will effectuate the purposes of Sections 4112.01 to 4112.08, Revised Code (Section 4112.05 [G]).

ORDER

The Commision finds that neither respondent has engaged in any unlawful discriminatory practices within the meaning of Sections 4112.01 to 4112.08, inclusive, Revised Code, and the complaint is dismissed.

By the Commission

February 14, 1962

Richard E. Guggenheim, CHAIRMAN

OPINION

The Ohio Civil Rights Commission, on its own motion, issued a complaint in the above entitled matter alleging that Musicians' Protective Union, Local No. 814 and Cincinnati Musicians' Association, Local No. 1, are engaged in discriminatory practices in violation of the Ohio Fair Employment Practices Act. The statutory provisions on which the complaint is based are Sections 4112.02 (C), (E) (5) and (H), Revised Code, reading as follows:

"Section 4112.02, Revised Code. It shall be an unlawful discriminatory practice:

\* \* \* \* \*

(C) For any labor organization to:

(1) Limit or classify its membership on the basis of race, color, religion, national origin or ancestry;

(2) Discriminate against any person or limit his employment opportunities, or otherwise adversely affect his status as an employee, or his wages, hours, or employment conditions, because of his race, color, religion, national origin or ancestry.

\* \* \* \* \*

(E) Except where based on a bona fide occupational qualification certified in advance by the commission, for any employer, employment agency or labor organization prior to employment or admission to membership, to:

\* \* \* \* \*

(5) Announce or follow a policy of denying, or limiting, through a quota system or otherwise, employment or membership opportunities of any group because of the race, color, religion, national origin, or ancestry of such group;

\* \* \* \* \*

(H) For any person to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of Sections 4112.01 to 4112.07, inclusive, Revised Code, or any order issued thereunder, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice.''

The alleged discriminatory practices are that Local 814 and Local 1 have followed a consistent practice of limiting membership on the basis of race or color and have discriminated in the matters of employment opportunities and wages, terms and conditions of employment on the basis of race and color. Upon due notice, a hearing was held on September 19, 1961, in Cincinnati, Ohio, before a hearing examiner appointed by the Ohio Civil Rights Commission.

A. *Alleged limitation of membership on the basis of race or color.*

Local 814 and Local 1 are members of the American Federation of Musicians and have common territorial jurisdiction. Early in its history, Local 1 wrote into its Constitution a limitation of membership to members of the Caucasian race and, in practice, strictly followed this restriction. Accordingly, in 1922 the Negro musicians in Cincinnati organized a union which was chartered by AFM as Local 814. Local 814 has never written into its Constitution or by-laws a limitation of membership based on race or color. However, prior to 1957 no member of Local 814 was white. Local 814 become popularly known as the ''colored union'' and Local 1 as the ''white union.''[1]

The establishment of ''white'' and ''colored'' local musicians' unions in the same territory is not peculiar to Cincin-

---

1. In October 1960, a meeting was held of the musicians' unions in Ohio in which Negro musicians are concentrated. The minutes of the meeting refer to these unions as "Negro Locals" and to the locals in which the white musicians are concentrated as the "white Locals."

nati. In several metropolitan areas in Ohio there exist two AFM locals, in one of which white musicians are concentrated and in one of which Negro musicians are concentrated. The same situation exists in some metropolitan areas in other states. The present policy of AFM is to deny a charter to any applicant which is a "white" or "colored" local and to encourage merger of existing "white" and "colored" locals. However, AFM policy does not contemplate revocation of the charter of a "colored" or "white" local which is opposed to merger.

In March 1958, prior to enactment of FEPA, Local 1 amended its Constitution to repeal the Caucasian clause. While due publicity was given to the change, the custom arising from the long practice of segregation continued and, as of the time of the hearing, there was no Negro member of Local 1. However, no evidence, other than statistics on the racial composition of the membership, was offered that Local 1, in practice, is referring Negro applicants to Local 814 or suggesting to such applicants that they would not be welcome in Local 1. No witness testified that any Negro applicant had been denied admission to Local 1 since FEPA was enacted. The President of Local 1 testified that no Negro musician has applied for membership in Local 1 since enactment of FEPA and that any musician would be accepted regardless of race or color. During the investigation incident to this case, Local 1, after an affirmative vote by its membership, proposed to Local 814 that the two unions merge. While Local 814 rejected the proposed merger,[2] Local 1's offer to merge was, as of the time of the hearing, still outstanding.

Local 814 has never had a written limitation on membership based on race or color. In 1957, prior to enactment of FEPA, Local 814 accepted a white applicant and in 1960 it accepted four more white applicants. The President and the Secretary-Treasurer of Local 814 testified that any competent

---

2. During the hearing, Local 1 made a proffer of evidence that Local 814 had rejected the proposed merger. This proffer is not admitted since it relates to conciliatory matters involving a respondent other than Local 1. However, later in the hearing, the Secretary-Treasurer of Local 814 testified that the members of Local 814, in a meeting held for that purpose, voted against the proposed merger. This evidence is admitted.

musician of good moral character would be accepted as a member, regardless of race or color. No evidence, other than the statistics on racial composition of the membership, was offered to show that, since enactment of FEPA, Local 814 has denied any application on the basis of race or color, or referred any white applicant to Local 1, or suggested to any white applicant that he would not be welcome in Local 814.

Local 814 opposes the merger, proposed by Local 1, on grounds including the following: (a) Negro musicians would not receive fair representation in a merged union since Local 1 has 1,100 members and Local 814 has only 107; (b) Negro musicians or orchestras having difficulties with their employers would receive less sympathetic treatment from white officials of a predominantly white union; and (c) in places where mergers have occurred, there has been some dissatisfaction on the part of Negroes. Without commenting on the merit of these grounds, it may be noted that they do not evidence an attempt to limit membership on the basis of race or color as such.

The concentration of white musicians in Local 1 and the Negro musicians in Local 814 exists because of a custom arising from a long period of segregation practiced prior to enactment of FEPA. This concentration may well continue as long as two locals are chartered to serve the same territory. The racial composition of a musical group is largely determined by employers, entertainment agencies and band-leaders. However, the existence of two labor unions in the same territory, having a pre-FEPA history of segregation, is a factor in the composition of musical groups. From time to time, employers, entertainment agencies and band-leaders inquire of the union regarding the availability of musicians and band-leaders. A Negro is less likely to join Local 1 knowing that inquiries for Negro musicians will be made to Local 814 and a white musician is less likely to join Local 814 knowing that inquiries for white musicians will be made to Local 1.[3] The existence of two locals in the same territory provides a built-in procedure through which an employer, entertainment agency or band-leader can

_____

3. The substantially higher initiation fees and dues assessed by Local 1 may also be a factor in the Negro musician's decision to join Local 814.

seek referral of musicians on the basis of race and color, rather than on the basis of musicianship, without mentioning race or color. Also, the type of music to be played may determine whether the person seeking a musician inquires of the one union or the other. However, there was no evidence offered to the effect that calls have been made to one union or the other for the purpose of discriminating on the basis of race or color. Nevertheless, if all musicians were in one union, there would be more assurance that a musician would be selected on the basis of his musical ability.

The complaint alleged that Local 814 and Local 1 limit membership on the basis of race or color. To find discrimination in the form of limitation of membership on the basis of race or color, it should appear that a person is being denied membership on the basis of race or color, or that he is being referred to the other local on the basis of race or color, or that he is being discouraged from joining the union of his own choosing. Insofar as the evidence adduced in the hearing is concerned, Local 814 and Local 1 are not now, and have not since enactment of FEPA, engaged in such conduct. Discrimination is not established by showing the existence in the same territory of two locals and that, due to pre-FEPA segregation practices, Negro musicians are voluntarily concentrated in one and white musicians are voluntarily concentrated in the other.

In view of the foregoing considerations, it is concluded that Local 814 and Local 1 are not limiting membership on the basis of race or color.

B. *Alleged discrimination in employment opportunities, wages, terms and conditions of employment, on the basis of race and color.*

The complaint alleged that Local 814 and Local 1 discriminate in employment opportunities and wages[4] on the basis of race and color.

In considering this allegation, it should be noted that control of the number of locals which may be chartered to serve the same territory is in the hands of AFM. Local 1 is not responsible for the fact that the charter of Local 814 is being

---

4. No evidence was offered of differences in other terms and conditions of employment of Negro and white musicians.

continued and Local 814 is not responsible for the fact that the charter of Local 1 is being continued. There is a substantial difference in the employment opportunities provided to their members by the two unions and some members of Local 814 perform for less than the union scale. This disparity in employment opportunities and wages results largely from the greater economic resources of Local 1.

Local 814 is a small union having a membership of only 107 and an annual budget of approximately $1,617.[5] This budget is too small to provide the service required of a labor union in our complex society. On the other hand, Local 1 is a substantial labor organization. It has approximately 1,100 members and an annual budget of approximately $26,870.[6] Local 1 provides very substantial services to its members. The services of the two locals contrast as follows:

| Activity | Local 814 | Local 1 |
|---|---|---|
| Collects wages and pays musicians | No | Yes |
| Publishes minimum wage scale | Yes[7] | Yes |
| Requires filing of musicians' contracts | Yes | Yes |
| Conducts promotional advertising for members | No | Yes |
| Publishes list of member band-leaders and booking agencies | No | Yes |
| Publishes list of member musicians and their instruments | No | Yes |
| Listed in yellow pages, telephone directory | No | Yes |
| Listed in white pages, telephone directory | No | Yes |
| Publishes News Letter | No | Yes |
| Amount life insurance per member | $200 | $1,000 |

5. Approximately nine new members are admitted annually and the initiation fee is $37. Annual dues are $12.

6. Approximately 75 new members are initiated annually and the initiation fee is $65. Annual dues, exclusive of insurance premium, are $20 annually.

7. Local 814 uses the list published by Local 1, except that Local 814 sets a scale for a few small establishments. Members of Local 814 inquire of Local 814 for the union scale if this information is unknown.

Deducts and accounts for:

| | | |
|---|---|---|
| Unemployment Compensation | No | Yes |
| Social Security | No | Yes |
| Workmen's Compensation | No | Yes |
| Federal and City Income Taxes | No | Yes |

It will be noted that Local 1 is able to promote employment opportunities for its members; provide means of communication between entertainment agencies, band-leaders and musicians, thereby increasing employment; ensure that payments are being made in behalf of employees to important social legislation funds; and supervise the union scale. Local 814 is not adequately staffed to do these things. Local 814's staff consists of two part-time officers, each of whom receives only $40 per month salary and only $10 per month for expenses. The staff of Local 1 consists of two full-time officers and four full-time office employees. Local 814 has no procedure for ensuring that payments are being made in behalf of its members for Social Security, Workmen's Compensation and Unemployment Compensation funds. Local 814 regards the union's function as limited to the establishment of a reasonable scale and ensuring observance of the scale. It does not recognize any responsibility to promote job opportunities.

The hearing showed that some members of Local 814 perform for less than the union scale. There was testimony by one night club owner and one band-leader that under-cutting the union scale is a common practice among members of Local 814. Examples were cited in which $10 per man, per night, had been paid while the minimum permitted under the union scale was $14. There was evidence that some members of Local 814 perform for approximately 50 per cent of the union scale. The Secretary-Treasurer of Local 814 testified that he had heard rumors of under-cutting, that he had investigated, but that he had not established any violations. This is not surprising since Local 814 has no effective means of supervising the union scale. The investigation consists of asking the employer whether he paid the union scale and asking the musician whether he received it. An affirmative reply would be expected. Local 814 requires that a copy of the entertainment contract be filed

with the union. It may be expected that this will reflect the union scale. However, the musicians are paid in cash which is placed by the employer in sealed envelopes and distributed by the band-leader. Thus, there is opportunity to pay less than is stated in the contract.

On the other hand, Local 1 has an effective procedure for policing the union scale. A copy of the contract is filed with Local 1's Contract Supervision Department. The band-leader brings the musicians' pay to the union office. Deductions are made from the musicians' pay and, in appropriate cases, contributions are made by the band-leader, for Social Security, Unemployment Compensation, Workmen's Compensation and Federal and City taxes. These are credited to each musician through an IBM record system. The union draws and mails to each musician a check for wages less deductions. In this way, Local 1 can be certain that every member receives at least the union scale.

It may be felt by some that the control exercised by Local 1 over wages received by musicians is extreme. However, the control is appropriate to the nature of the problems of union scale supervision and accounting for contributions to social legislation. Musicians at the night club entertainment level typically play short engagements and membership of bands changes with considerable frequency. This leads to insecurity of employment and competitive under-cutting of the union scale. The short duration of employments leads to laxness in establishing procedures for ensuring that contributions will be made by and in behalf of musicians to important social benefit programs. This has an adverse economic impact on the musicians and on the community for, lacking these programs, some musicians may be expected to become public charges.

It must be recognized that Local 814 is not sufficiently strong and economically sound to fulfill the responsibilities of a musicians' union. The inability of Local 814 to police the union scale results in under-cutting of the union scale and a lower standard of living for Negro musicians than white musicians enjoy. The hearing did not establish whether some Negro musicians prefer lax enforcement of the union scale in order that they may compete for employment which would not be available to them at the union scale. However, it would not be

surprising to find that some Negro musicians, especially those having limited musical ability, desire to be able to under-cut the union scale when necessary to find employment. However, in the long run such a practice degrades the wage scale of Negro musicians in general. It may also have an adverse impact on the wage scale of musicians who hold membership in Local 1. Moreover, the failure of Local 814 to provide a means of accounting in behalf of their members for contributions to social legislation programs may result in loss of some of these benefits.

AFM was not a respondent in this matter and comment upon it is made reluctantly. Had it been, no doubt some justification would have been offered for maintaining "white" and "colored" locals in the same territory. Where both unions own their union halls and there are substantial benefit funds and other properties held by each union, a merger is complex. However, the two unions in Cincinnati do not own union halls or substantial funds. The time is past for fostering within a democratic society distinctions on the basis of race and color. It is particularly anachronistic to find such a distinction fostered by a national labor organization. In continuing charters for "white" and "colored" locals, AFM is, in the long run, contributing to the lowering of the standard of living of Negro musicians and is undermining the hard won gains of social legislation enacted for the benefit of working people over the past thirty years. The existence of "colored" and "white" locals, for which AFM is responsible, provides a built-in opportunity to employ musicians on the basis of race and color without mention of this factor and, thus, renders difficult the achievement of the objective of FEPA, which is employment on the basis of ability.

The complaint alleges that Local 814 and Local 1 discriminate in employment opportunities on the basis of race and color. Local 814 is not able to provide for its members employment opportunities equivalent to those provided by Local 1 for its members. However, this does not result from discrimination by either Local 814 or Local 1 on the basis of race or color. Assuredly, Local 814 desires the fullest opportunity of employment for its members. To the extent that the two unions are responsible for the difference in employment oppor-

tunities, it results from the fact that the Negro musicians are voluntarily concentrated in a union which lacks the economic resources to provide promotional campaigns and placement services. If either union were refusing to refer a musician on the basis of race and color or refusing membership on the basis of race and color so that the musician could not qualify for employment, this would constitute discrimination. However, no evidence of this character was offered.

Also, the complaint alleges discrimination in wages on the basis of race and color. The hearing established that there is a developing disparity between the wages received by Negro musicians, members of Local 814, and white musicians, members of Local 1. However, this disparity results from Local 814's inability to supervise entertainment contracts of its members and Local 1's ability to supervise contracts of its members. It does not result from any scheme by either union or both to classify musicians for different wage scales on the basis of race and color. No evidence of any such practice was offered.

To find on the evidence in this case discrimination in employment opportunities and wages on the basis of race and color, it must be found that the mere existence of Local 814 is unlawful discrimination because its membership consists largely of Negro musicians and the inferior facilities of Local 814 achieve a comparatively lower wage scale for some of its members and fewer employment opportunities for some of its members than are provided by Local 1 to its membership. To sustain this position, if it is sustainable at all, it is necessary to show that upon dissolution of Local 814 or merger of it with Local 1, the present membership of Local 814 would join Local 1 and would thereafter receive improved employment opportunities and increased wages. Termination of Local 814 would leave the membership free to join Local 1 or to become non-union musicians. Non-union musicians do perform in the Cincinnati area. Those who joined Local 1 would, when employed, receive at least the union scale. In the long run, employment opportunities would increase and they might increase immediately. However, on the basis of the record, it cannot be said that marginal musicians, at least, would not have fewer employment opportunities than they receive presently through the undercutting of the union scale. Those who became non-union, it

may be assumed, would be marginal performers who receive less than the union scale but who might obtain more employment by performing for less than the union scale. Obviously, the foregoing are assumptions. However, they are reasonable assumptions and, viewing them in the light most favorable to the complaint, it is not established that substantially all members of Local 814 would receive improved job opportunities and higher wages as a result of dissolution or merger of Local 814.

Assuming that the existence of Local 814, under the circumstances established by the record, were found to be an unlawful practice, the matter of an effective remedy would pose problems. It would be necessary that the Ohio Civil Rights Commission order a mandatory merger or issue a cease and desist order which could only be complied with through dissolution of Local 814 or merger of Local 814 and Local 1. Yet, Local 1 is not responsible for the continuation of Local 814 and Local 814 is not responsible for the continuation of Local 1. As AFM was not made a respondent, the possibility of an order to cease and desist the chartering in Ohio of "white" and "colored" locals is not available.

The remedial power granted by FEPA is very broad. It states that upon finding an unlawful practice the Commission "shall issue * * *an order requiring the respondent to cease and desist from such unlawful discriminatory practice and to take such further affirmative or other action as will effectuate the purposes" of the Act "including, but not limited to, hiring, reinstatement, or upgrading employees with, or without, back pay, admission or restoration to union membership * * *." It may be noted that an order which requires merger of labor unions or dissolution of one of them is a more drastic remedy than those specially mentioned in the statute. While the express remedies are merely examples, it would seem that, if any were expressed in the statute, it would have included those regarding which there might have been serious question. If the Commission has power to issue an order to labor organizations to merge or to dissolve, presumably it has authority to order the merger of corporations where circumstances of concentration of Negroes in one and concentration of whites in the other re-

sult in differences in wages or other terms and conditions of employment. While the Ohio General Assembly does not record its deliberations on proposed legislation, it is doubtful that the General Assembly intended that complex economic patterns, solvable only through dissolution or merger of business units, should be solved through a Civil Rights statute. The issue of whether the Commission has such power is not reached in this opinion. However, the drastic nature of the remedy which would be required is some indication that the existence of Local 814 as a union in which Negro musicians voluntarily concentrate and in which, for economic reasons, fewer employment opportunities and lower wages prevail, is not, in itself, a violation of Section 4112.02 (C) (2), Revised Code.

C. *Alleged discrimination in announcing or following a practice of denying or limiting employment or membership on the basis of race or color.*

The complaint encompassed Section 4112.02 (E) (5), Revised Code, making it an unfair employment practice to announce or follow a policy of denying, or limiting, through a quota system or otherwise, employment or membership opportunities of any group because of race or color.

A contrary policy has been announced by both Local 814 and Local 1 and, as the foregoing discussion shows, neither union is following a policy of denying or limiting membership or employment on the basis of race or color.

D. *Alleged discrimination in aiding or abetting another in the commission of an act constituting an unlawful discriminatory practice.*

The complaint encompassed Section 4112.02 (H), Revised Code, making it an unlawful practice for any person to aid, abet, or incite another in the commission of an act declared to be an unlawful discriminatory practice. Beyond the existence of Local 814 and Local 1 as unions in which, as a result of pre-FEPA discriminatory practices, different races are voluntarily concentrated and differences in employment opportuni-

ties and wages prevail, there is no evidence that any officer of a union or other person is aiding, abetting, inciting, etc., the commission of any act constituting an unlawful discriminatory practice.

## FINDINGS OF FACT

1. Local 814 and Local 1 are labor organizations within the meaning of FEPA and have their offices in Cincinnati, Ohio.

2. Local 1 has not, since enactment of FEPA, included in its Constitution or by-laws a limitation of membership based on race or color.

3. Local 1 has not, since enactment of FEPA, on the basis of race or color, rejected any application for membership or referred any applicant to Local 814 or discouraged any person from making application for membership in Local 1.

4. Local 1, subsequent to the initiation of investigation in this case, proposed to Local 814 that the two locals merge and, at the time of hearing, this proposal was outstanding.

5. At the time of the hearing, the membership of Local 1, approximately 1,100, did not include any Negro musician.

6. The concentration of white musicians in Local 1 results from a long period of discrimination on the basis of race and color, which terminated prior to enactment of FEPA.

7. Local 814 has never included in its Constitution or by-laws a limitation of membership based on race or color.

8. Local 814 has not, since enactment of FEPA, on the basis of race or color, rejected any application for membership or referred any applicant to Local 1 or discouraged any person from making application for membership in Local 814.

9. As of the time of the hearing, the membership of Local 814, numbering 107, included five white musicians, one of whom was admitted prior to enactment of FEPA.

10. The concentration of Negro musicians in Local 814 is voluntary and results from the long period of exclusion of Negro musicians from Local 1, which exclusion terminated prior to enactment of FEPA.

11. Local 814 rejected the merger proposal by Local 1 on grounds other than limitation of membership on the basis of race and color, including the ground that in a union composed

of approximately 1,100 white musicians and 107 Negro musicians, the Negro musicians would not be adequately represented.

12. Local 1 has greater economic resources than Local 814, the annual income of Local 814 being approximately $1,617 and the annual income of Local 1 being approximately $26,870 and, thus, Local 1 is able to provide greater services to its members than Local 814 provides to its members.

13. Local 1 conducts promotional activities and provides communication between prospective employers and its members, thereby increasing the employment opportunities of its members. Local 814 has no similar services.

14. Local 1 supervises the entertainment contracts of its members, ensuring that at least the union scale is received. Local 814 lacks resources to supervise the union scale and a substantial number of its members under-cut the union scale.

15. Local 1 assures that payments are made by or on behalf of its members for Workmen's Compensation, Social Security and Unemployment Compensation. Local 814 lacks resources to account for such payments in behalf of its members and, in view of the short engagements and frequent change in membership of musical groups, some of its members may lose benefits in these social programs.

16. The differences in employment opportunities and wages received by members of Local 814 and Local 1 do not result from discrimination on the basis of race or color.

17. The announced policy of Local 814 and Local 1 is that there is no limitation of membership on the basis of race or color.

18. Neither Local 814 nor Local 1 is aiding, abetting or inciting the other to commit acts constituting violations of FEPA.

CONCLUSIONS OF LAW

Neither Local 814 nor Local 1 has engaged in any unlawful discriminatory practice proscribed by Sections 4112.02 (C) (1) and (2), (E), (5) or (H), Revised Code.

RECOMMENDATION

It is recommended that the complaint against Local 814

and Local 1 in Case No. 2 before the Ohio Civil Rights Commission be dismissed.[8]

Roscoe L. Barrow
HEARING EXAMINER

8. During the hearing, Local 814 and Local 1 moved that the complaint be dismissed. The authority of the hearing examiner is limited to conducting the hearing and making findings of fact, conclusions of law and recommendations. The Ohio Civil Rights Commission may approve, modify or disapprove these and may take additional testimony. The procedure contemplates that the hearing examiner will not take any action dispositive of the merits of the case but will make recommendations to the Commission as to the disposition of the case. Accordingly, the hearing examiner has not ruled on the motions to dismiss.